## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARIE BAPTISTE-ELMINE, FREDDY ELMINE, YVONNE JONES, OCHIEZE OKORONKWO, PRECILIA OKORONKWO, ROSE PROPHETE, and DICKSON REGALADO,<br><br>Plaintiffs,<br><br>v.<br><br>RICHLAND & FALKOWSKI, PLLC and SN SERVICING CORPORATION,<br><br>Defendants. | Civil Action No.: 21-cv-4994<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

### INTRODUCTION

1.      Plaintiffs Marie Baptiste-Elmine and Freddy Elmine ("Ms. Baptiste-Elmine and Mr. Elmine"), Yvonne Jones (hereinafter "Ms. Jones"), Ochieze and Precilia Okoronkwo ("Mr. and Mrs. Okoronkwo"), Rose Prophete ("Ms. Prophete"), and Dickson Regalado ("Mr. Regalado") (collectively, "Plaintiffs") bring this action to redress a series of illegal actions Defendants Richland & Falkowski, PLLC ("Richland & Falkowski") and SN Servicing Corporation ("SN Servicing," collectively, "Defendants") have taken, including attempting to collect time-barred debt, in violation of federal and state law.

2.      Plaintiffs are New York homeowners who were shocked to find themselves in foreclosure on second mortgage loans that had long disappeared, the servicers having long since ceased to send mortgage statements, sometimes for a decade or more—even though federal regulations required such statements to be sent monthly.

3.      Under the advice of counselors, mortgage brokers, and sometimes the servicers themselves, the Plaintiffs were led to believe that these second mortgages—all predatory "piggyback" second mortgage loans made to Plaintiffs when they were first-time or new homeowners in 2005, 2006, or 2007—were long gone, forgiven, or incorporated into loan modifications of their first mortgage loans.

4.      Now, all these years later and during the coronavirus pandemic, after Plaintiffs had stabilized their finances through loan modifications of their first mortgage loans, Defendants acted in concert to aggressively pursue collection on payments they concede are 8, 10, or even 15 years old, payments that are clearly time-barred by New York's six-year statute of limitations.

5.      Through illegal threats to sue on incorrect and therefore vastly overinflated amounts, foreclosure lawsuits seeking improper sums, and deceptive mortgage statements, Defendants, subject to the Federal Fair Debt Collection Practices Act, have caused Plaintiffs financial harm and intensive emotional distress.  Defendant SN Servicing's collection actions also violated the New York State Deceptive Practices Act, to the acute detriment of the affected Plaintiffs.

## **JURISDICTION**

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 for claims under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*  This Court has jurisdiction pursuant to 28 U.S.C. § 1367 for Plaintiffs' claims under state law.

## VENUE

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events and omissions giving rise to this Complaint occurred within the Eastern District of New York.

## PARTIES

8.      Plaintiff Marie Baptiste-Elmine, a 42-year-old woman, and Plaintiff Freddy Elmine, a 51-year-old man, wife and husband, live with their children, ages 13, 17, and 21, in their home at 119-12 220th Street, Cambria Heights, NY 11411.  Ms. Baptiste-Elmine works as a respiratory therapist at a hospital; Mr. Elmine is employed as a school bus driver.

9.      Plaintiff Yvonne Jones, a 66-year-old woman, lives in her home at 346 Lott Avenue, Brooklyn, NY 11212, her home of 15 years, with her husband Wallace M. Jones.  Until she retired in 2020, Ms. Jones worked in the division of customer service for the New York City Department of Education.

10.     Plaintiff Ochieze Okoronkwo, a 63-year-old man, and Plaintiff Precilia Okoronkwo, a 47-year-old woman, husband and wife, live with their children, ages 9, 17, and 20, in their home at 32-30 Mickle Avenue, Bronx, NY 10469.  Mr. Okoronkwo is now retired; he made his career as a youth counselor in the Bronx.  Mrs. Okorowko works as a medical technologist.

11.     Plaintiff Rose Prophete, a 50-year-old woman, lives with her husband and her children, ages 18 and 23, at 15 Paerdegat 6th Street, Brooklyn, New York 11236, her home of 15 years.  Ms. Prophete works as a hospital technician; her husband is employed as a driver for a car service company.

12.    Plaintiff Dickson Regalado, a 45-year-old man, lives with his children, ages 13, 17, and 21, in his home at 132-11 85th Street, Ozone Park, NY 11417.  Mr. Regalado works as a computer network administrator.

13.    Defendant Richland & Falkowski, PLLC is law firm located at 35-37 36th Street in Astoria, Queens, New York.  Richland & Falkowski is a high-volume debt collection law firm whose principal business is the enforcement of security interests through a robust practice of prosecuting foreclosures in the New York State courts.

14.    Defendant SN Servicing is a wholly owned subsidiary of Security National Master Holding Company, LLC and a corporation organized under the laws of Alaska.  SN Servicing maintains its principal place of business at 13702 Coursey Blvd Bldg. 1, Baton Rouge, Louisiana 70817.  SN Servicing is a conforming and "special servicer" of residential mortgage loans, specializing in collecting on defaulted or delinquent loans.  SN Servicing has serviced the mortgage debt of Plaintiffs Marie Baptiste-Elmine and Freddy Elmine, Plaintiffs Ochieze and Precilia Okoronkwo, Plaintiff Rose Prophete, and Plaintiff Dickson Regalado and acts or acted as the agent of mortgage purchase trusts BCMB1 Trust and NS194, LLC.  As part of its business, SN Servicing services defaulted and delinquent loans in the state of New York.

**STATEMENT OF FACTS**
*Plaintiffs Marie Baptiste-Elmine and Freddy Elmine*

15.    Ms. Baptiste-Elmine and Mr. Elmine live in their home, a one-family property located at 119-12 220th Street, in the Cambria Heights neighborhood of Queens, NY.

16.    Ms. Baptiste-Elmine and Mr. Elmine live in their home with their children, ages 13, 17, and 21.

17.    Ms. Baptiste-Elmine and Mr. Elmine purchased their home in March of 2005.

18.      Before their purchase of their home in March of 2005, Ms. Baptiste-Elmine and Mr. Elmine had never purchased a home.  They were unfamiliar with the process and did not know what to expect.  They purchased the home with two mortgages, a large loan and a smaller "piggyback" loan, both from WMC Mortgage Corporation.

19.      After only a short time, Ms. Baptiste-Elmine and Mr. Elmine started to receive solicitation phone calls from a company called Countrywide.  The sales representative from Countrywide told Ms. Baptiste-Elmine and Mr. Elmine that their purchase mortgages would soon become more expensive, and they had to refinance right away to reduce their payment.

20.      Ms. Baptiste-Elmine and Mr. Elmine were current on their payments, but they were worried that the Countrywide representative might be right, and their payments might increase.  They were, accordingly, persuaded to refinance their loans into a single refinance loan.

21.      The Countrywide representative also solicited Ms. Baptiste-Elmine and Mr. Elmine for a new second mortgage, convincing them that a second loan would provide funds for Ms. Baptiste-Elmine and Mr. Elmine to make needed repairs to their home.

22.      Although Ms. Baptiste-Elmine and Mr. Elmine were not looking for additional funds, the Countrywide representative's pitch convinced them that they should take out these funds and make some repairs to increase the value of their home.

23.      Although Ms. Baptiste-Elmine and Mr. Elmine only had one closing for both loans, public records indicate that Countrywide purported to date the first mortgage, a consolidated loan for $433,000, as of September 26, 2006, and the second loan for $37,450, as of January 17, 2007.

24.      The second loan bore an exorbitant interest rate of 8.25%.

25.     Ms. Baptiste-Elmine and Mr. Elmine were able to make payments on both loans for some time, but they fell behind in 2008 when their employment income was reduced.

26.     Ms. Baptiste-Elmine and Mr. Elmine sought and obtained a loan modification of the first mortgage loan from their mortgage servicer.

27.     Ms. Baptiste-Elmine and Mr. Elmine stopped receiving mortgage statements for the second mortgage loan.  They did not receive a statement for the second mortgage loan for many years.

28.     Ms. Baptiste-Elmine and Mr. Elmine thought that their second loan was consolidated into the first loan modification, which was corroborated by the fact that they stopped receiving statements for that loan.

29.     Ms. Baptiste-Elmine and Mr. Elmine did not receive statements for their second loan even after the Consumer Financial Protection Bureau amended Regulation X in 2014 to require that a statement be sent on all residential mortgage loans, including those in delinquency status.

30.     In 2019, Ms. Baptiste-Elmine and Mr. Elmine began to receive collection statements that purported to pursue payment of the second mortgage loan.  Because they were sure that their second mortgage had been modified with their first, Ms. Baptiste-Elmine and Mr. Elmine thought these notices were scams.

31.     In the fall of 2020, Ms. Baptiste-Elmine and Mr. Elmine were shocked to receive a summons and complaint, dated September 28, 2020, bearing the index number 717009/2020, entitled *BCMB1 Trust v. Freddy Elmine* et al., commencing a foreclosure action on the long-absent second mortgage, which they believed had been consolidated and modified years before.

6

32.     Ms. Baptiste-Elmine and Mr. Elmine were confused and panicked to receive foreclosure documents requesting payments from over a decade before.  They were terrified they would lose their home.  They had no way to tell that some of the payments that the foreclosing plaintiff sought could not legally be collected.

33.     Ms. Baptiste-Elmine and Mr. Elmine had never heard of the foreclosing plaintiff in the lawsuit, BCMB1 Trust, which purported to be Ms. Baptiste-Elmine and Mr. Elmine's creditor.  The summons and complaint were filed by Defendant Richland & Falkowski, attorneys representing BCMB1 Trust.

34.     The foreclosure complaint purported to seek collection of individual payments due from January 1, 2009 to the date of filing in 2020, including payments that were due more than six years prior, whose collection were barred by the governing New York statute of limitations.

35.     Recent statements from the current mortgage servicer claim amounts totaling over $49,000 to reinstate loan payments accruing since February 2009—including years of payments that cannot legally be collected—and over $79,000 to pay off the loan, this on a debt that totaled only $37,450 when it was made.

36.     Defendants' illegal actions have left Ms. Baptiste-Elmine and Mr. Elmine stressed and depressed.  They have lost sleep over whether they can repay the tens of thousands of dollars sought, and whether they might lose their family home.

### Plaintiff Yvonne Jones

37.     Ms. Jones lives in her home, a one-family property located at 346 Lott Avenue, Brooklyn, NY 11212, in the Brownsville neighborhood.  Ms. Jones, now retired, spent her career

working, first as a clerk at a private business, and later at the New York City Department of Education.

38.     Ms. Jones lives in her home with her husband, Wallace M. Jones.

39.     Ms. Jones purchased her home in February 2006.

40.     At the time of purchase, Ms. Jones was renting an apartment and had never bought a home before.

41.     In order to buy her home, Ms. Jones had to seek a mortgage loan.

42.     Although she used a mortgage broker, she did not know the terms of the mortgage before she sat down at the closing table to sign the papers.  The mortgage broker provided her with an attorney for the transaction, but that attorney did not provide her with advice, nor explain the papers to her.

43.     Only after she completed the closing, when she started to receive statements, did Ms. Jones come to understand that—even though she had put her life savings down to purchase the property—she had taken out two loans and that her home would be encumbered by two mortgages.

44.     Both loans, a first loan for $263,120 and a second loan for $65,780 were originated by Fremont Investment & Loan—a now discredited predatory and discriminatory lender.

45.     The second loan bore an exorbitant 11.5% rate of interest.

46.     After her closing, Ms. Jones made payments on both mortgages, but she soon fell into default as the combined payments were unaffordable to her.

47.     Ms. Jones was able to modify her first mortgage loan, and she stopped receiving statements on her second mortgage loan.  Ms. Jones did not receive statements from the servicer of her second mortgage loan for many years.

48.     Ms. Jones did not receive mortgage statements for her second loan even after the Consumer Financial Protection Bureau amended Regulation X in 2014 to require that a statement be sent on all residential mortgage loans, including those in delinquency status.

49.     In winter of 2021, Ms. Jones was confused to receive a summons and complaint, dated January 28, 2021, bearing the index number 502303/2021, entitled *NS194, LLC v. Yvonne Prescott*, et al., commencing a foreclosure action on the long-absent second mortgage.

50.     Ms. Jones had never heard of the foreclosing plaintiff in the lawsuit, which purported to be her creditor.  The summons and complaint were filed by Defendant Richland & Falkowski, attorneys representing NS194, LLC.

51.     Richland & Falkowski's mortgage papers purported to seek collection of individual payments due from July 1, 2006 to the date of filing in 2021, including payments that were due more than six years prior, outside of the governing New York statute of limitations.

52.     Ms. Jones suffered great mental strain from the foreclosure on her second mortgage.  She was confused and scared that she would lose her home.  Ms. Jones began to suffer headaches.  She felt stressed and panicked.

53.     Ms. Jones had no way to tell that some of the payments that the foreclosing plaintiff sought could not legally be collected.

### *Plaintiffs Ochieze Okoronkwo and Precilia Okoronkwo*

54.     Mr. and Mrs. Okoronkwo live in their home, a one-family property located at 32-30 Mickle Avenue, Bronx, NY 10469, in the Eastchester neighborhood.

55.     Mr. and Mrs. Okoronkwo live in their home with their children, ages 9, 17, and 20.

56.     Mr. and Mrs. Okoronkwo purchased their home in January of 2006.

57.     Before that time, neither Mr. Okoronkwo nor Mrs. Okoronkwo had ever purchased a home.  They were unfamiliar with the process and did not know what to expect.  They found a local real estate broker, who helped them find a one-family property.

58.     In order to buy their home, Mr. and Mrs. Okoronkwo had to seek a mortgage loan.  The real estate broker told them he could help them find a mortgage loan.  When the process dragged on, Mr. Okoronkwo went into a local real estate office and asked about a mortgage loan.  The broker in the real estate office said that he could find the Okoronkwos a loan quickly.

59.     Unbeknownst to Mr. and Mrs. Okoronkwo, and without their direction, the mortgage broker arranged for them to receive two mortgage loans, rather than one.

60.     Mr. and Mrs. Okoronkwo also paid $20,000 towards the purchase of their home.

61.     At the closing, Mr. and Mrs. Okoronkwo were overwhelmed with papers.  The people present kept telling them to hurry to finish signing and did not give them time to read the papers.  Because the real estate agent had provided them with an attorney, Mr. and Mrs. Okoronkwo thought that their interests were protected.  Even after the closing was completed, Mr. and Mrs. Okoronkwo did not know that they had two mortgage loans, rather than one.

62.     Both loans were from WMC Mortgage, a now discredited predatory and discriminatory lender, a first loan for $340,000 and a second loan for $85,000.

63.     The second loan bore an exorbitant 10.5% rate of interest.

64.     Only after the closing, when they received their first mortgage statements, did Mr. and Mrs. Okoronkwo realize they had two loans.

65.     Mr. Okoronkwo confronted the mortgage broker, who said that if the Okoronkwos paid for three months, their payments would be combined into one loan.

66.     The Okoronkwos made their payments and appealed to bank representatives, but neither WMC, nor their servicer, Wilshire, would assist the Okoronkwos to combine the loans and payments as promised.

67.     Although the payments on the two loans were very expensive, Mr. and Mrs. Okoronkwo paid both loans for as long as they could.  They sought and obtained two loan modifications of the first mortgage loan, and were able to negotiate an affordable first mortgage loan payment.

68.     Soon after they modified the first loan for the first time in 2011, Mr. and Mrs. Okoronkwo stopped receiving statements for the second mortgage loan.  They did not receive a statement for the second mortgage loan for nearly a decade.

69.     Mr. and Mrs. Okoronkwo received advice from a housing counselor that they did not need to worry about their second mortgage after modifying their first. Because of this advice and because they stopped receiving statements for the second loan, they did not believe they still needed to make payments on a second mortgage loan.

70.     Mr. and Mrs. Okoronkwo did not receive statements for their second loan even after the Consumer Financial Protection Bureau amended Regulation X in 2014 to require that a statement be sent on all residential mortgage loans, including those in delinquency status.

71.     In November of 2020, Mr. and Mrs. Okoronkwo were shocked to receive a notice from Defendant SN Servicing, a company they had never heard of.  This notice threatened

foreclosure, and stated that Mr. and Mrs. Okoronkwo's home loan was 4,030 days past due and that they owed over $103,000 in past due debt.

72.     This notice threatened to sue Mr. and Mrs. Okoronkwo for amounts that were outside New York's statute of limitations, and which therefore could not be collected in a foreclosure action.

73.     Mr. and Mrs. Okoronkwo were stressed and shocked to receive this notice, seeking to collect so many years of payments totaling over $100,000.  They worried, thinking about all their attempts over the years to find stability and create one affordable payment on their home.

74.     In the spring of 2021, Mr. and Mrs. Okoronkwo were further shocked to receive a summons and complaint, dated March 24, 2021, bearing the index number 804084/2021E, entitled *NS194, LLC v. Precilia Okoronkwo* et al., commencing a foreclosure action on the long-absent second mortgage.

75.     Mr. and Mrs. Okoronkwo had never heard of the foreclosing plaintiff in the lawsuit, NS 194, LLC, which purported to be their creditor.  The summons and complaint were filed by Defendant Richland & Falkowski, attorneys representing NS194, LLC.

76.     The foreclosure complaint purported to seek collection of individual payments due from October 1, 2009 to the date of filing in 2021, including payments that were due more than six years prior, outside of the governing New York statute of limitations.

77.     Mr. and Mrs. Okoronkwo were devastated to receive the foreclosure papers, terrified they might lose the home they loved and that they had worked so hard to maintain for their family.  They suffered stress and lost sleep.  Mrs. Okoronkwo suffered from headaches whenever she thought about the risk that they might be evicted from their home.

78.     Mr. and Mrs. Okoronkwo had no way to tell that some of the payments that the foreclosing plaintiff sought could not legally be collected.

### *Plaintiff Rose Prophete*

79.     Ms. Prophete lives with her family in her home, a two-family property located at 15 Paerdegat 6th Street, Brooklyn, NY 11236, in the Canarsie neighborhood.  She lives with her husband and two children, ages 18 and 23.

80.     Ms. Prophete purchased her home in May 2005.

81.     In order to buy their home, Ms. Prophete and her partner at the time had to seek a mortgage loan.

82.     Only a little more than a year after they completed the purchase, the broker who arranged their original financing encouraged Ms. Prophete and her partner to refinance to lower their monthly payments.

83.     Ms. Prophete was paying the mortgage and handling all of the costs and upkeep for her home.  Believing that a refinance would help lower her costs, Ms. Prophete agreed to a refinance into a new first and second mortgage loan.  The mortgage broker told Ms. Prophete that this financing structure would be the most financially advantageous to her.

84.     Both loans were from Fairmont Funding Ltd., a now discredited predatory and discriminatory lender.  The first loan was for $504,000 and the second loan was for $63,000.

85.     The second loan bore an exorbitant 9% rate of interest.

86.     Although the payments on the two loans were very expensive, Ms. Prophete made full monthly payments on both loans through 2008.

87.     Ultimately, Ms. Prophete received a letter from Bank of America stating that she and her co-borrower no longer needed to make payments on the second loan.[1]  After receiving this letter, Ms. Prophete did not receive any statements for the second mortgage loan for nearly a decade.

88.     Ms. Prophete obtained a modification of her first mortgage loan in October 2011, and soon was making regular payments.  Because Bank of America had notified her that she no longer had a second mortgage, Ms. Prophete was not concerned that she did not receive statements for the second mortgage loan, nor did she worry about falling behind on that loan.

89.     Ms. Prophete did not receive mortgage statements for her second loan even after the Consumer Financial Protection Bureau amended Regulation X in 2014 to require that a statement be sent on all residential mortgage loans, including those in delinquency status.

90.     In March of 2021, Ms. Prophete was shocked to receive a summons and complaint, dated January 28, 2021, bearing the index number 502277/2021, entitled *NS194, LLC v. Rose Prophete* et al., commencing a foreclosure action on the long-absent second mortgage.

91.     Ms. Prophete had never heard of the foreclosing plaintiff in the lawsuit, which purported to be her creditor.  The summons and complaint were filed by Defendant Richland & Falkowski, attorneys representing NS194, LLC.

92.     The complaint purported to seek collection of individual payments due from January 1, 2009 to the date of filing in 2021. The total amount claimed included payments that

---

[1] In the early 2010s, large servicers, including Bank of America, maintained programs to forgive second mortgage debt in order to satisfy settlements with state and federal regulators. *See, e.g.*, "The Second Mortgage Shell Game," NYTimes, Feb. 17, 2013, available at nytimes.com/2013/02/18/opinion/the-second-mortgage-shell-game.html.

became due more than six years prior to the commencement of the lawsuit and were therefore outside of the governing New York statute of limitations.

93.     Ms. Prophete was devastated to receive the foreclosure complaint.  She felt terrified that all the effort she had put into maintaining her home for her family could be taken away from her at any time.  She was scared and shocked that the lawsuit demanded payments from such a long time ago, after years of hearing nothing.

94.     Ms. Prophete had no way of knowing that some of the sums that the lawsuit sought could not legally be collected.

95.     After Defendant Richland & Falkowski filed the foreclosure action, Ms. Prophete received a statement from Defendant SN Servicing, a company she had never heard of before.

96.     This statement was the first statement that Ms. Prophete had received for the second mortgage loan in nearly a decade, since she was advised by Bank of America that the loan was cancelled.

97.     Through its statements, Defendant SN Servicing *also* purported to seek collection of amounts that were due more than six years prior, outside of New York's statute of limitations.

98.     Recent statements from the current mortgage servicer claim amounts totaling over $78,000 to reinstate loan payments accruing since February 2009—including years of payments that cannot legally be collected—for a total of over $130,000 to pay off the loan, this on a debt that totaled only $63,000 when it was made.

99.     Defendants' illegal actions have caused Mr. Prophete grave distress, worry, and fear.

*Plaintiff Dickson Regalado*

100.    Mr. Regalado lives in his home, a one-family property located at 132-11 85th Street, in the Ozone Park neighborhood of Queens, NY.

101.    Mr. Regalado lives in his home with his children, ages 13, 17, and 21.

102.    Mr. Regalado purchased his home in October of 2006.

103.    Before that time, Mr. Regalado had never purchased a home.  He was unfamiliar with the process and did not know what to expect.  He and his wife at the time looked around the neighborhood where they were living with her parents and found a one-family property that would fit their growing family.

104.    Mr. Regalado had saved funds towards the purchase of a home, but the broker told him it was not necessary to use the money to make a down payment.  Instead, he advised Mr. Regalado to take out two loans.

105.    Both loans were from affiliates of Countrywide Home Loans, a now discredited predatory and discriminatory lender, a first loan for $318,848 from America's Wholesale Lender and a second loan for $79,712 from Countrywide Bank.

106.    The second loan bore an exorbitant 8.5% rate of interest and had predatory features, such as a prepayment penalty and payment "balloon" at maturity.

107.    The payments on the two loans were expensive, and Mr. Regalado was able to sustain payments on both loans for less than a year, before suffering loss of income.

108.    Ultimately, Mr. Regalado obtained a modification of his first mortgage loan. Around that time, the servicer stopped sending statements for the second loan.

109.    Because Mr. Regalado received advice that he did not need to worry about his second mortgage loan after modifying the first loan, and because he stopped receiving statements

for the second loan, he did not believe he still needed to make payments on a second mortgage loan.

110.    Mr. Regalado did not receive mortgage statements for his second loan even after the Consumer Financial Protection Bureau amended Regulation X in 2014 to require that a statement be sent on all residential mortgage loans, including those in delinquency status.

111.    In 2019, Mr. Regalado began to receive collection statements that purported to pursue payment of the second mortgage loan.  He was distressed, as he had thought that the second loan was gone.  He became very worried that he would lose the home that he had worked so hard to purchase, pay for, and maintain.

112.    In April of 2020, Mr. Regalado was shocked to receive a notice from Defendant SN Servicing.  This notice threatened to bring a foreclosure action, and stated that Mr. Regalado's home loan was 3,430 days past due and that he owed over $69,259.96 in past due debt.

113.    This notice threatened to sue Mr. Regalado for amounts that were outside New York's statute of limitations, and which therefore could not be collected in a foreclosure action.

114.    Mr. Regalado felt shock and intense fear that he might lose his home.  He panicked and began to lose sleep over the large sums sought.

115.    In fall of 2020, Mr. Regalado was further shocked to receive a summons and complaint, dated September 9, 2020, bearing the index number 715320/2020, entitled *BCMB1 Trust v. Dickson A. Regalado* et al., commencing a foreclosure action on the long-absent second mortgage.

116.    Mr. Regalado had never heard of the foreclosing plaintiff in the lawsuit, which purported to be his creditor.  The summons and complaint were filed by Defendant Richland & Falkowski, attorneys representing BCMB1 Trust.

117.    The complaint purported to seek collection of individual payments due from January 1, 2009 to the date of filing in 2020, including payments that were due more than six years prior, outside of New York State's statute of limitations.

118.    Mr. Regalado was terrified over the loss of the home he had poured so much into, investing his time and resources into making the space a home for his family.  He panicked and was unable to sleep.  He felt depressed and empty.

119.    Mr. Regalado could not tell from the foreclosure documents that many of the payments sought could not legally be collected.  He was anxious about how he could find such a large sum to save his home.

120.    Mr. Regalado continued to receive statements from SN Servicing and a subsequent servicer.  The August 2021 statement claimed amounts totaling over $76,000 to reinstate loan payments accruing since December 2010—including years of payments that cannot legally be collected—for a total of over $150,000 to pay off the loan, this on a debt that totaled only $79,000 when it was made.

121.    Defendants' illegal actions have caused Mr. Regalado anxiety, depression, and fear.

### *Public Records Show Defendants Are Pursuing Hundreds of Thousands of Dollars of Time-Barred Debts in Foreclosures Filed in New York Courts*

122.    At the time they received the summons and complaints in the foreclosure actions commenced against them, Plaintiffs each knew only of their own shock at the emergence of a long-disappeared second mortgage loan and of the efforts to foreclose on them.

123.     Though they did not know it, Plaintiffs were victims in a coordinated scheme to use deceptive notices and the New York Courts to wrest excessive, time-barred payments from unwitting borrowers.

124.     Public records reveal that Richland & Falkowski has represented BCMB1 Trust, NS194, LLC, and related trusts in nearly 70 foreclosure actions in the New York State courts.

125.     All but a handful of these foreclosure lawsuits—all filed during the coronavirus pandemic—seek payments, together totaling hundreds of thousands of dollars, that are barred by New York's statute of limitations, each foreclosure representing a violation of the federal Fair Debt Collection Practices Act.

126.     Public filings also reveal that Defendant SN Servicing is implicated in many of these efforts to collect on time-barred payments through foreclosure actions, further evidence of Defendants' pattern and practice of colluding to extract time-barred payments from consumers in violation of the New York State Deceptive Practices Act.

127.     In illegally and deceptively seeking these payments from Plaintiffs and from other New Yorkers, the Defendants put significant numbers of homeowners—many of whom have struggled to achieve housing stability and are at great pains to remain current on a first mortgage during the pandemic—at risk of losing their homes or defaulting on their first mortgages in order to settle debts that should never have been demanded.

## FIRST CAUSE OF ACTION

### FAIR DEBT COLLECTION PRACTICES ACT
**(All Plaintiffs Against Defendant Richland & Falkowski)**

128.     Plaintiffs repeat and reallege paragraphs 1 through 127 of the Complaint as if fully set forth herein.

129.    Congress enacted the Fair Debt Collection Practices Act (the "FDCPA"), 15 U.S.C. § 1692 *et seq*., in 1977, "to eliminate abusive debt collection practices by debt collectors, [and] to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged . . . ." 15 U.S.C. § 1692(e).

130.    Plaintiffs are all "consumers" within the meaning of 15 U.S.C. § 1692a(3), in that the debt that was sought to collect from them is a consumer debt.

131.    Richland & Falkowski is a "debt collector" as defined in 15 U.S.C. § 1692a(6) because:

    a.    It is a person who regularly uses instrumentalities of interstate commerce and the mails in a business the principal purpose of which is the collection of debts, and regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another; and

    b.    Its business has as its principal purpose the enforcement of security interests in judicial foreclosure proceedings.

132.    Defendant Richland & Falkowski violated the following provisions of the FDCPA:

    a.    15 U.S.C. § 1692e, by using false and deceptive representations in connection with the collection of a debt claimed to be owed by Plaintiffs; and

    b.    15 U.S.C. § 1692e(2), by misrepresenting the character, amount, or legal status of the asserted debt.

133.    Specifically, Defendant Richland & Falkowski violated the FDCPA by filing foreclosure lawsuits against all Plaintiffs that:  (1) attempted to collect incorrect amounts including amounts that were not owed on their mortgage loans, and (2) misrepresented the amount owed on all of Plaintiffs' mortgage loans.

134.    As a result of Richland & Falkowski's conduct, actions, and omissions, Plaintiffs have suffered actual damages including the costs of damage to their credit rating and impairment of their ability to obtain credit.

135.    Plaintiffs have also suffered damage to reputation, embarrassment, humiliation, and other emotional and mental distress resulting from Richland & Falkowski's violation of the FDCPA.

136.    As a result of Richland & Falkowski's violations of the FDCPA, Plaintiffs seek:

   a.    Compensatory damages to be determined at trial;

   b.    Statutory damages;

   c.    Costs and disbursements; and

   d.    Attorney's fees.  15 U.S.C. § 1692k(3).


## SECOND CAUSE OF ACTION

### FAIR DEBT COLLECTION PRACTICES ACT
**(Plaintiffs Ochieze Okoronkwo and Precilia Okoronkwo Against Defendant SN Servicing)**

137.    Plaintiffs repeat and reallege paragraphs 1 through 136 of the Complaint as if fully set forth herein.

138.    SN Servicing is a "debt collector" as defined in 15 U.S.C. § 1692a(6) because:

   a.    It is a person who regularly uses instrumentalities of interstate commerce and the mails in a business the principal purpose of which is the collection of debts, and regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another, and

   b.    It acquired Plaintiffs Ochieze and Precilia Okoronkwo's account when the account was already claimed to be in default.

139.    Defendant SN Servicing violated the following provisions of the FDCPA:

a. 15 U.S.C. § 1692e, by using false and deceptive representations in connection with the collection of a debt claimed to be owed by Plaintiffs;

b. 15 U.S.C. § 1692e(2), by misrepresenting the character, amount, or legal status of the asserted debt; and

c. 15 U.S.C. § 1692e(5), by threatening to take an action that cannot legally be taken or that is not intended to be taken.

140. Specifically, Defendant SN Servicing violated the FDCPA by sending Plaintiffs Ochieze Okoronkwo and Precilia Okoronkwo each a 90-day pre-foreclosure notice that: (1) claimed amounts were owed on Plaintiffs' mortgage that incorrectly included amounts that could not be collected because they were outside of New York State's statute of limitations, (2) misrepresented the amount owed on the mortgage, and (3) threatened to bring a foreclosure action that would seek a judgment for amounts barred by the applicable statute of limitations.

141. As a result of SN Servicing's conduct, actions, and omissions, Plaintiffs Ochieze and Precilia Okoronkwo have suffered actual damages, including the costs of damage to their credit rating and impairment of their ability to obtain credit.

142. Plaintiffs Ochieze Okoronkwo and Precilia Okoronkwo have also suffered damage to reputation, embarrassment, humiliation, and other emotional and mental distress as a result of SN Servicing's violation of the FDCPA.

143. As a result of SN Servicing's violations of the FDCPA, Plaintiffs Ochieze and Precilia Okoronkwo seek:

a. Compensatory damages to be determined at trial;

b. Statutory damages;

c. Costs and disbursements; and

d. Attorney's fees. 15 U.S.C. § 1692k(3).

## THIRD CAUSE OF ACTION

**DECEPTIVE PRACTICES ACT**
**NEW YORK GENERAL BUSINESS LAW § 349**
**(Plaintiffs Ochieze Okoronkwo, Precilia Okoronkwo, Rose Prophete,**
**and Dickson Regalado Against Defendant SN Servicing)**

144.     Plaintiffs repeat and reallege paragraphs 1 through 143 of the Complaint as if fully set forth herein.

145.     SN Servicing conducts business and furnishes a service as those terms are defined by New York General Business Law § 349 (the "Deceptive Practices Act").

146.     SN Servicing's business practices are consumer-oriented.  SN Servicing services mortgage loans for homeowners throughout New York.  SN Servicing's loan servicing practices have a broad impact on consumers with little knowledge of the practices or procedures of the mortgage industry.

147.     Moreover, complaints to the federal Consumer Financial Protection Bureau catalogued in a database that is available to the public demonstrate that SN Servicing shows a troubling pattern of attempting to collect on time-barred debts.

148.     Upon information and belief, SN Servicing as servicer of the subject mortgage loans, arranged for Richland & Falkowski's representation and directed the foreclosure lawsuits seeking time-barred debt.

149.     SN Servicing has violated the Deceptive Practices Act by engaging in acts that were misleading in a material way, deceptive, and contrary to public policy and generally recognized standards of business.

150.     SN Servicing violated the Deceptive Practices Act by:

  a.   Pursuing collection and satisfaction of payments that came due more than six
       years prior to the commencement of collection efforts, and hence were no longer

collectable under the statute of limitations for collection of a mortgage debt under New York state law.

    b.  Sending pre-foreclosure notices demanding payment of time-barred debt, abusing New York's statutory borrower protections in an attempt to coerce Plaintiffs into paying amounts that they did not owe and that Defendants could not enforce.

151.    Defendant willfully and knowingly undertook these illegal acts in violation of the General Business Law.

152.    As a result of SN Servicing's deceptive conduct, actions, and omissions, Plaintiffs have suffered actual damages.

153.    In addition to pecuniary losses, Plaintiffs suffered actual harm as a result of SN Servicing's violations of GBL §349(a), including but not limited to, the annoyance, time, frustration, anger, and anxiety incurred by Plaintiffs.

154.    As a result of the aforesaid violations of the Deceptive Practices Act, SN Servicing is liable to Plaintiffs for:

    a.  Compensatory damages to be determined at trial;

    b.  Statutory damages;

    c.  Treble damages;

    d.  Exemplary damages;

    e.  Injunctive relief;

    f.  Costs and disbursements; and

    g.  Attorney's fees.  N.Y. G.B.L. § 349(h).

WHEREFORE, Plaintiffs respectfully request that this Court:

    a.  Grant the relief requested in Counts One through Three herein;

b. Award compensatory damages and interest in the amount to be determined at trial, including pain and suffering in the form of embarrassment, humiliation, and other distress in the amount to be determined by the jury;

c. Award statutory damages;

d. Pursuant to the Deceptive Practices Act, enjoin Defendant SN Servicing from engaging in the deceptive practice of pursuing collection activities on any of its customers' time-barred payments;

e. Award further injunctive relief;

f. Award Plaintiffs reasonable attorney's fees and costs for this action; and

g. Award such other further relief as the Court deems just and proper.

DATED:      September 5, 2021
               Brooklyn, NY

BROOKLYN LEGAL SERVICES

By:       _____
Arthur Burkle
Rachel Geballe
Terry Herman
Catherine Isobe
105 Court Street, 4th Floor
Brooklyn, NY 11201
(718) 237-5500 (tel)
(718) 875-8546 (fax)
*Attorneys for Plaintiffs*